# UNITED STATES DISTRICT COURT
## for the
### District of Maryland

AUG 0 7 2013

| | |
|---|---|
| United States of America<br>v.<br>**DEANDRE KELLY**<br>DOB: 11/XX/1981<br>SSN: XXX-XX-0068<br><br>*Defendant(s)* | )<br>)<br>)  Case No.  **13-1864SAG**<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __January 22 and 23, 2011__ in the county of __Garrett__ in the _____ District of __Maryland__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841 | Possession with intent to Distribute Crack Cocaine; |
| 18 U.S.C. § 922(g) | Unlawful Possession of a firearm; |
| 18 U.S.C. § 752(a) | Escape; and |
| 18 U.S.C. § 924(c) | Using/Carrying a firearm during and in relation to a crime of violence |

This criminal complaint is based on these facts:
See Attached Complaint Affidavit

☑ Continued on the attached sheet.

_____
Complainant's signature

D.U.S.M. David D. Ablondi
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __08/07/2013__

_____
Judge's signature

City and state: __Baltimore, Maryland__    Hon. Stephanie A. Gallagher, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

Deputy United States Marshal, David D. Ablondi, being duly sworn, states the following:

1. This is an Affidavit in support of a Criminal Complaint charging:

**DEANDRE KELLY**
Male/Black/DOB: 11/X/1981
SSN: XXX-XX-0068

with possession to distribute cocaine base, a Schedule II controlled substance in violation of Title 21, U.S.C. § 841; with being a prohibited person unlawfully in possession of a firearm in violation of Title 18 U.S.C. § 922 (g); with Escape, in violation of Title 18 U.S.C. § 752(a); and with using and carrying a firearm during and in relation to a crime of violence, in violation of Title 18 U.S.C. § 924(c).

## I. AFFIANT.

2. Your affiant is a Deputy United States Marshal with the United States Marshals Service and, as such, I am charged with enforcing all laws in all jurisdictions of the United States, its territories and possessions. I have been a Deputy United States Marshal for 12 years. I have been conducting criminal fugitive investigations for the past 9 years. Your affiant has knowledge of the facts set forth as a direct result of my participation in this investigation as well as from my review of reports from, and discussions with, other law enforcement personnel.

## II. STATEMENT OF FACTS AND CIRCUMSTANCES.

### A. BACKGROUND.

3. On or about July 15, 2009, the defendant, DEANDRE KELLY, *(KELLY)* appeared before the Honorable Emmet G. Sullivan in the United States District Court for the

1

District of Columbia. At that time, KELLY entered a plea of guilty to conspiracy to distribute and possess with the intent to distribute 1 kilogram or more of PCP (in case 09-168), and unlawful possession with the intent to distribute five grams or more of cocaine base (in case 09-171). At the conclusion of that hearing, KELLY was released pending sentencing, with various standard conditions. KELLY subsequently absconded and a bench warrant was issued for his arrest on September 15, 2009. KELLY remained a fugitive until January 22, 2011.

4. On January 22, 2011, at approximately 5:00 p.m., KELLY and two other individuals, Amber James (James) (the driver) and Richard Hall (Hall), (back seat passenger) were stopped by Maryland State Police Trooper First Class Farrell for speeding. At that time, the car was traveling east bound on Interstate 68 near Friendsville, Garrett County, Maryland. As James and Hall exited the vehicle, KELLY, who had been in the front passenger seat, jumped into the driver's seat and took off at a high rate of speed. Troopers pursued KELLY until he crashed the vehicle. KELLY gave a false name, however his fingerprints provided his true name.

5. KELLY was taken into custody and initially transported to the Garrett County Memorial Hospital. A search of the vehicle revealed a pound of marijuana on the front passenger side floor, where KELLY had been seated, and a .40 caliber Taurus PT24-7 firearm loaded with fifteen rounds in the magazine located under the rear portion of the driver's seat. The firearm was positioned such that it was placed under the seat by someone in the back seat. The serial number was filed off of the weapon. Approximately, 47 grams of suspected crack cocaine and a small amount of marijuana were recovered from KELLY's pants. Hall and James were also taken into custody. James bonded out later that evening, and Hall was detained at the Garrett County Detention Center in Oakland, Maryland.

6. Some time during the day on January 23, 2011, KELLY was transported from the aforesaid hospital to the Garrett County Detention Center, to be held for an initial appearance on Monday January 24, 2011. At approximately, 8:00 p.m., however, KELLY brandished a firearm, assaulted the officers working in the detention center, and escaped. A portion of the escape was caught on the security video at the Garrett County Detention Center.

7. Law enforcement officers with the Garrett County Sheriff's Office, U.S. Marshal Service, Federal Bureau of Investigation, and the Fugitive Unit of the Maryland State Police initiated an investigation. As part of this investigation, they began to review phone calls made from the detention center by KELLY and Hall.[1] Based on this review, it became readily apparent that through these conversations, more fully described herein, KELLY had planned this escape with several individuals, to include the Hall, Amanda Lambert (Lambert), Eric Nibbins (Nibbins), Christopher Green (Green), and Jamal Kelly (J. Kelly), the younger brother of defendant KELLY. Through the combined efforts of Lambert, Hall, Nibbins, Green, J. Kelly, and others, KELLY was able to have a car waiting outside the jail for him, and he was taken from the area to a safe location, his brother's home, in Prince Georges County, Maryland.

## B. PLANNING MEETING AT DEANDRE KELLY'S GIRLFRIEND'S HOUSE.

8. During the short time that KELLY was incarcerated, he made several telephone calls. He called his girlfriend, Autumn Taylor (Taylor) several times. Through several interviews at different times with girlfriend Taylor, agents determined that on Sunday, January 23, 2011, Chaquita Richardson (Richardson) and her boyfriend, Nibbins, met Taylor in Cumberland. Taylor advised that she, Nibbins, and Richardson went to Taylor's home that

---

[1] These calls are routinely recorded at this detention center with the legally appropriate warnings.

3

Sunday, and stayed there most of the day. Taylor described an older black mini-van with Virginia tags that Richardson and Nibbins were in. Taylor indicated that the van had a dark interior and that it was really dirty. Taylor recalled telling Richardson that KELLY had a federal warrant for his arrest and was going to be held without bond. Taylor stated that at approximately 4:00 p.m. T. J. Hall showed up at her house with two other black males, who agents have determined were J. Kelly and Robert Marshall (Marshall). Taylor advised that she did not know the names of these two men and had never seen them before. However, Taylor stated that (based on the conversations in the house) she believed that one of the men was possibly named "Jamal." Taylor stated that she asked T. J. Hall why he was up there (in Cumberland). T.J. Hall told her that he was there to get KELLY's stuff out of a storage place in Cumberland. Taylor stated that the other two black males continually went in and out of the house. Taylor also said that all of them used her bedroom to have private talks as well. Taylor recalled that at 6:00 p.m., Richardson, Nibbins and T.J. Hall left. The two other men were still there, but left after that. Richardson and Nibbins returned later that evening around 10:00 p.m. or 10:30 p.m. At that time, Nibbins advised "everything is fine, D's (KELLY) out..." Taylor asked him what he meant, and Nibbins said, "...he's out. The cops are going to press you... don't say anything, pack your stuff, be back in a couple days." Nibbins also stated that KELLY would be calling her. Taylor stated that at that point she realized that they broke KELLY out of jail.

## C. TELEPHONE CALLS FROM DETENTION CENTER PLANNING THE ESCAPE.

9. A review of telephone calls made from the detention center on that Sunday, January 23, 2011, reflected the following:

* At 2:49 p.m., KELLY called his girlfriend, Autumn Taylor and spoke with both Richardson and Nibbins. KELLY asked Richardson if she had told anyone his real name. Richardson told him no. KELLY then stated "Yeah well I mean, well they know my name... Yeah the people they coming from DC tomorrow to get me..." (*See* Transcript A, pg 3.) Later in the call, KELLY told Nibbins that the detention center was "...like a group home..." and that he should come see him that day. (*See* Transcript A, pg 11.) KELLY then communicated to Nibbins, in coded language, that he had a gun inside the jail with him. Nibbins replied, "Well let me see what I can get, you know what I'm saying, we need to get like close like right there so then you know when I get right there then. . . . " (*See* Transcript A, pg 15.) Agents understand that Nibbins will work on being in a car near the detention center because KELLY had a gun inside the jail and will be making an escape attempt.

* At 4:56 p.m., KELLY called defendant Hall's girlfriend, Amanda Lambert. After KELLY spoke with Lambert, Hall got on the phone and also spoke with Lambert. Hall told Lambert, "...I need to get out of here first. And quick. It needs to be quick." (*See* Transcript B, pg 5.) Agents understand that at that point, Hall knew that KELLY was going to try to escape, and Hall knew that his chances of release would diminish after an event like that. Hall then spoke with Deonte Coley, a/k/a "Cuz," about bonding Hall out. Hall told Coley "I just need to get up out of here so he can get up outta here." Coley replied, "There can't nobody come home but you." Hall replied, "No, trust me." Hall added, "He said there was only one found." (*See* Transcript B, pg 7.) Agents understand that when Hall was talking about getting bailed out before KELLY got out, that Coley, believing Hall was talking about a bail for KELLY, was merely stating the reality that with the federal warrant out of D.C., KELLY was not going to get a bail. Hall, understood that KELLY had his own plan for getting out, and it was tied to the fact that only one gun was found during the arrest the day before. Hall was telling Coley that KELLY had a gun in the jail with him, and would be getting out.

* At 5:16 p.m., Hall called Lambert back. Hall spoke with Coley and said, "I need to get out of here before it's fucked up for me." (*See* Transcript C, pg 11.) Hall directed Lambert to call Christopher Green and have Green call Richardson on behalf of KELLY, so KELLY could determine "of they still comin' up and if so what time?" Coley advised that "they" had been at Autumn Taylor's house all day already. (*See* Transcript C, pg 17.) Telephone records reflect a call thereafter at 5:34 p.m. to Richardson's telephone.

5

\*      At 5:37 p.m., Hall called Lambert again. Lambert asked, "what exact, they want to know what exactly do you want them to come up there for, like what can they do right now?" Hall replied, "He's leaving." Lambert asked again, if "they" would be able to see him." Hall replied, "he's gonna need a ride." (*See* Transcript D, pg 1.) Agents could hear Lambert relaying the information to someone in the background, either Green or Coley. Hall then directed Lambert to "tell him at the, be at the main joint... the back." Lambert repeated to "him" "at the main building, back of it." (*See* Transcript D, pg 3.)

\*      At 7:04 p.m., KELLY called Lambert's phone and asked to speak with Coley. KELLY asked Coley to call Richardson's telephone, and determine where "they" were. (*See* Transcript E, pg 2.) At approximately 7:05 p.m., Coley contacted Richardson (via another phone) while still speaking with KELLY (on Lambert's phone). Coley advised KELLY that "they outside chilling.... behind the main building right?" Agents believe this was a reference to Nibbins, Richardson and T.J. Hall who were waiting outside of the detention center by that point in time. (*See* Transcript E, pg 2.) KELLY asked Coley if "they" were at the right place. Coley advised that they were at the main building near the courtroom where they were told to go. Richardson's voice can be heard from being on the other telephone with Coley as Coley spoke with KELLY. (*See* Transcript E, pg 3.) KELLY then asked "how the coast look?" A male voice on the other telephone with Coley answered, "clear." Coley repeated that information to KELLY. (*See* Transcript E, pg 4.) KELLY asked if "they" could see the ramp. Coley repeated the question and the answer to KELLY. (*See* Transcript E, pps 4-5.) KELLY advised them (through Coley) to not "...be out in the open and just be quiet and chill out." KELLY told Coley that he was "just waiting for the time man." (*See* Transcript E, pg 5.)

\*      Finally, at approximately 7:51 p.m., KELLY called Green and asked if he was with Coley at that time. Green said he was. KELLY then asked Green to call and check on the status of the others. Agents understand the others to be Nibbins, Richardson and T.J. Hall waiting outside of the detention center. Green advised KELLY, that "my grandpa, say, um, he still you know, his vision clear . . . but um he's sitting in his chair and he ain't going nowhere so you know he'll be around to answer the phone." KELLY misunderstood the last part and responded "nobody ain't got no phone. Once the nigger leave, his phone. . . there ain't no phone." Green responded, "No, I'm talking about um, my grandpa say he not goin' nowhere." KELLY acknowledged his understanding, and Green added, "See what I'm saying. So he, he going to be around to um, you know, he going, he, he, he going to be around until you. . .he find out . . you know, where you . . . " Agents believe that Green was letting KELLY know, that his getaway car was standing by. (*See* Transcript F, pg 2-3.)

### D. CONFIDENTIAL SOURCE INFORMATION.

10.  Investigators spoke with a confidential source that provided additional information regarding the escape. This source advised that J. Kelly, Robert Marshall, and T.J. Hall, were going to Garrett County, Maryland specifically, to pick up KELLY. The source stated that these three individuals went to Taylor's house in Cumberland, Maryland, and met up with Nibbins and Richardson, and planned the escape. Based on the information provided, the plan was for Nibbins, Richardson and T.J. Hall to drive to the Garrett County Detention Center and wait. Once KELLY escaped, the three were to transport him from Oakland to Cumberland where KELLY's brother, J. Kelly, and Robert Marshall would be waiting to pick up KELLY. Nibbins, Richardson and T.J. Hall drove from Cumberland to the Garrett County Detention Center in a black van that Richardson had rented. When KELLY escaped, Nibbins, Richardson and T.J. Hall picked up KELLY, and took him to a Comfort Inn in Grantsville, Maryland, where they met J. Kelly and Marshall. The source stated that KELLY and T.J. Hall then got into J. Kelly's car, and they traveled to J. Kelly's apartment in College Park, Maryland.

### E. CHAQUITA RICHARDSON.

11.  On January 27, 2011, investigators learned that the van used in the escape had been located and was being stored at an impound lot belonging to the Washington D.C. Metropolitan Police Department. On January 31, 2011, investigators traveled to this location to obtain and process the van. On site, investigators were led to a black in color 2004 Chrysler Towne and Country van with Virginia license plate # XHR-2855. During the processing, investigators noted that the van was poorly maintained and had a dirty interior. Thereafter, investigator determined that Richardson had rented this vehicle from a car rental place in Alexandria, Virginia. Following the arrest of Chaquita Richardson, on February 2, 2011,

Richardson was advised her of her rights and gave a statement. Richardson advised that she had rented the van prior to the escape. Richardson further stated that she did drive to Garrett County to pick up KELLY, but claimed she was forced to do so.

### F. ROBERT MARSHALL.

12. Following the arrest of Robert Marshall, Marshall was advised of his rights and gave a statement. Marshall said he had just moved back to College Park from Alabama. Marshall knew J. Kelly, who told him that his brother (KELLY) had been arrested and that J. Kelly, needed to go to get KELLY's stuff. J. Kelly asked Marshall if he wanted to ride with him and Marshall agreed. Marshall stated that they picked up T. J. Hall on the way, because T.J. Hall knew how to get to Taylor's house in Cumberland, Maryland. Marshall further advised that when they arrived at the residence, KELLY's girlfriend (Taylor) was there with another male and a female. (Nibbins and Richardson.) Marshall recalled that Taylor was crying, and T. J. Hall and Nibbins went upstairs. Marshall advised that a few minutes later, they called J. Kelly to also come upstairs. Marshall remembered that the female, (Richardson), kept running from upstairs to downstairs. Marshall said that Nibbins, Richardson, and T. J. Hall eventually left in a black van. Marshall said that he and J. Kelly stayed at that location for a couple hours. Marshall recalled that T. J. Hall called later and told them not to leave him because he needed a ride back to the Washington Metropolitan area. T.J. Hall also advised during this telephone call, that "they" were not going to be able to get "Ransom," Richard Hall, out. T.J. Hall suggested that they start on their way to Garrett County. Marshall said they drove up the road, got off the highway at a motel, and eventually the black van pulled in. KELLY and T. J. Hall got out of the van, and into J. Kelly's gray Infiniti and drove to J. Kelly's apartment in College Park, Maryland.

### G. AMBER JAMES AND COREY KLINGLER.

13. On January 28, 2011, investigators interviewed Amber James, the person driving the car during the initial arrest on January 21, 2011. During the interview James stated that Autumn Taylor had recently allowed her and her boyfriend, Corey Klingler, to stay at Taylor's residence for a couple of weeks. The first day that James and Klingler stayed with Taylor was on Friday, January 21, 2011. James recalled that KELLY arrived at the house later that evening. James stated that the following day she used Taylor's car to go to Morgantown, West Virginia. Prior to leaving, defendant Hall arrived at the home. Both Hall and KELLY went along for the ride.

14. Investigators interviewed Corey Klingler. Klingler stated that he knew Nibbins. Klingler stated that on Saturday January 22, 2011, Taylor found out about the arrests (of KELLY, Hall and James) and told Klingler. Klingler stated that he still stayed at Taylor's house on Saturday night. Klingler said that on Sunday, January 23, 2011, he was preparing to leave the residence when Taylor, Richardson and Nibbins arrived. Klingler recalled that Nibbins stated "...I gotta go get my boy out..." Klingler stated that at the time he thought this was a reference to bonding KELLY out of jail. Klingler then stated that he left the home to bond his girlfriend Amber James out of jail.

### H. RICHARD HALL.

15. On Friday, January 28, 2011, agents interviewed defendant Hall after advising him of his Miranda rights. During questioning, Hall advised that KELLY did have a handgun during the escape and described the firearm as a .380 caliber. Hall stated that the firearm was black and silver in color with a magazine feed that held six rounds. Hall advised that he was familiar with the weapon having fired it in the past when hanging around with KELLY in

9

Cumberland. Hall also stated that KELLY had other firearms as well, which he described as two .40 caliber handguns, a .44 caliber handgun, two 9 mm handguns, a Walther .22 caliber handgun, and an "AK" with a collapsible stock. Hall further advised that as he was in the holding cell with KELLY, Hall saw KELLY in possession of the .380 caliber handgun. According to Hall, KELLY was able to smuggle the firearm inside the jail by concealing it in a "fat roll" around his stomach.[2] Hall advised that KELLY pulled the firearm out and showed it to Hall. Hall admitted to making calls for KELLY to assist him in the escape out of fear.

16. DEANDRE KELLY remained a fugitive again until his arrest on or about May 2, 2011, in Lynchburg, Virginia. He is pending sentencing in U.S. District Court in the District of Columbia on October 4, 2013.

17. The identities of all of the defendants described herein has been confirmed through photographic identifications, and/or by the above-described interviews with persons who know and are affiliated with these defendants.

### III. CONCLUSION.

18. In summary, your affiant submits that on January 22, 2011, DEANDRE KELLY was in possession of a firearm and cocaine base, in violation of Title 21 U.C.S. § 841 and Title 18 U.S.C. § 922(g). On January 23, 2011, DEANDRE KELLY did use and carry a firearm

---

[2] Agents believe that when KELLY was taken to the hospital, he was able to hide the gun in the bag with his clothing and when he returned to the jail, he secreted the gun once again in the "fat roll."

during and in relation to a crime of violence in violation of Title 18 U.S.C. § 924(c), and did escape from custody under or by virtue of any process issued under the laws of the United States, in violation of Title 18 U.S.C. § 751(a).

Respectfully submitted,

David D. Ablondi
Deputy United States Marshal
United States Marshal Service

Sworn to and subscribed before me this ___7th___ day of August, 2013.

Stephanie A. Gallagher
United States Magistrate Judge